May it please the Court. My name is Jason Rodman and I represent the appellant Barbara Richards. I would like to preserve three minutes for rebuttal. You have to keep time for yourself on that. Right, Your Honor. I intend to preserve. Thank you. This is a step five case in a social security disability denial of benefits and it's a case about pain. And the issues I'm going to show today are first that the credibility analysis to set up the residual functional capacity is in error. And then second, that the administrative logic decision improperly overemphasized activities of daily living. And so preliminarily as to the credibility analysis as it relates to the RFC, this case assigns a very reduced range of sedentary work. What seems to be just up to the point but not a hair over in terms of deciding whether this claimant was or wasn't disabled. Just enough so it's not disabled. And Richards asserts that had a proper pain analysis, credibility analysis been done, it would have pushed it over that edge. And you see this starting out even in the introduction discussing the analysis on page nine of the decision 8 out of 21 where based on the sort of procedural fiction that of course the prior decision was correct. That the plaintiff therefore must show, I think I'm pointing accurately here, sudden deterioration. And Richards admits that that's not the proper standard and that throws off the whole credibility analysis from the get go. And then second, right after that on the same page, the ALJ opinion on page nine, error 21, delves into past work and assigns a dollar value, I think it's $10,000, to say that this claimant doesn't have a good connection to work. Which in the case law lines up with sort of starting the claimant out at a lower level of credibility than other claimants from the get go based on not having a strong work record. Did you raise that issue, the poor connection to work issue in the district court? What was raised in the district court was that credibility was not properly assessed. But did you specifically raise the argument about the poor connection to work being an improper basis for the ALJ? No, not in that narrow sense. And on that basis, I don't want to dwell on it. But there are implicit things, and this is already briefed, there are implicit things connected to tying that to a dollar amount that don't match up with the testimony. And so had the credibility analysis been done correctly, as Richards argued in the district court, that issue would have resolved itself and there would have been no point to argue it. It would have been moved. And then how do you reconcile your client's application for unemployment benefits, which requires her to be able to work with her request for disability benefits? Because it's at the same time. That's right. So Richards wanted to work. She desired to work. She sought out work, which is different than her being able to work. Isn't there a representation when seeking unemployment benefits that you're able to work? Isn't there an implicit representation? My understanding is that you're right, that there is some implicit representation that the person at least seeks work. I haven't briefed this issue narrowly in detail. But if she didn't even qualify for the preliminary having a past job that would pay a portion of those unemployment benefits, the whole notion that she applied for benefits, unemployment benefits, because she was unemployed and needed some income, it doesn't – that seems like a confusion of credibility standards. So when – in general, this ALJ opinion seems to go on the subsequent pages from a situation where a prior practitioner on the record indicated Richard's ability to sit only a short period of time. Stand only a short period of time. And then a subsequent record after that where things have clearly gone downhill. But the ALJ doesn't address or make clear exactly which statements by the claimant are given weight or the reasons for those weight. And an example of those statements might even be that she sought unemployment benefits and what her basis for that would be. And because of that, it makes it very difficult to review the case under the applicable standards, which is grounds for – Mr. Rodman, let me ask you. Focusing on the ALJ's decision, what's the single best example in the decision in your view that daily activities were over-weighted in the analysis? Can you point me to the page and paragraph that you have in mind? I don't have the page and paragraph in front of me, but after I sit down, I can look for that. The babysitting example comes to mind where she helped kids of friends watch their kids while they were away. And then she could go in the other room and sleep if she wanted to. And so that fits in terms of the performance standards. It wasn't comparable to a work environment. In terms of the flexibility she had, it wasn't comparable to a work environment. In terms of potential help, in some ways because the older kids didn't need to be in the room with her, that itself was help. Likewise, as to the marketing for that activity. So after the point at which the friends were no longer leaving their kids with her because their kids had basically aged out, why pay this lady? Her M.H.T., which is a mental health technician, which is the only counselor-type person she seems to have gotten along with. She seems to have had severe conflicts with the assigned psychologist. But the M.H.T. seems to have pushed her to go out and put up some flyers. I don't know exactly how many flyers she did or didn't. But again, it comes to that same Bjornsson-style analysis, all three prongs. Mr. Rodman, you have two minutes left. Yes, thank you. And I will answer your narrow question in detail on response unless you guys have any other questions for me. Thank you, Kelly. Good morning. May it please the Court, I'm Jay Hinesley and I represent the appellee in this case. Your Honors, with regard to the argument that's actually raised in the brief, we do continue to stand firmly on our position that Ms. Richards has waived the argument with regard to the on-task. I just wanted to make that clear. In district court, the argument was very narrow. She very narrowly argued that the ALJ improperly relied on the fact that her new alleged onset date was just one day after she had been denied on her previous application. Now, the district court rejected this argument and Ms. Richards, in the brief, talks about the prominence of an on-task issue in addressing credibility in RFC. She doesn't, Mr. Rodman doesn't bring that up today in court, but that's primarily the argument that's raised in the brief. Ms. Richards did not raise or even hint at this issue in district court. For that reason, we ask this court to decline to address this wholly new issue. More fundamentally, however, we ask that this court uphold the ALJ's decision. One, because it is supported by substantial evidence, and two, the ALJ here built a rational, logical bridge with thorough analysis from the evidence to his conclusion about Ms. Richards' RFC, and ultimately, his conclusion that Ms. Richards was not disabled. Now, with regard to the credibility analysis, first of all, if I could point out, the district court also pointed out the thorough analysis that ALJ Pearson engaged in. She, the district court, mentioned over nine full pages of analysis, more than enough evidence to support the ALJ's conclusion, end of quotes. ALJ Pearson considered Ms. Richards' testimony, which involved, yes, a history of abuse and depression, difficulty sleeping at night. ALJ addressed her allegations of migraine headaches, carpal tunnel symptoms. He addressed fully her allegations of physical limitations. He even addressed her mother's statement, statements from Ms. Richards' prior and current boyfriend, addressed other impairments such as obesity, and then he engaged in a thorough analysis of the subjective complaints. ALJ Pearson devoted four full pages to a discussion of the mental evidence relating to her mental condition, followed by five full pages devoted to the evidence of her physical impairments. Finally, he considered the opinion evidence, which was a consultative examiner, Dr. Bowen, and treating examiners, Dr. Colcarni, Dr. Nagel. He considered the independent vocational consultant's statement, as well as the state agency physicians who reviewed the record. Now, the credibility analysis here, it was not penned on any one thing. It was not penned on the daily activities. He did certainly consider those activities as well as he should and actually was required to. He also considered various other factors. Essentially, the ALJ was trying to determine, do these individual things enhance her credibility? In other words, does it weigh in her favor? He looked at the new onset date. Now, frequently, and I would even say most of the time, an onset date relates to an event. Something has happened. You had an accident, injury. Perhaps you needed surgery and it has now made you allegedly disabled. Here, the onset date was October 5, 2011. There's no evidentiary basis for this. It's the day after the prior ALJ's decision. It was the earliest date on which she could have alleged disability on this application. She didn't appeal the prior denial. It went through the four layers of review and did not take it to district court. Next, the ALJ looked at her earnings record. Now, he picked a figure of $10,000. Is that arbitrary? Perhaps. But the point is, he was taking a look at, did this individual work all of her life steadily? Did she show a commitment to work and unfortunately now is disabled and unable to do so? He was not able to credit her with that. Simply, that's all that was. Third, he looked at the unemployment compensation application that Your Honor pointed out, and he appropriately pointed out that there is a disconnect there. When you apply for unemployment benefits, you are required to make a statement and an assertion that you are able and you are looking for work, and that is completely at odds with her simultaneous application for disability benefits in which she's saying she is disabled. She's unable to work. That was appropriate. The ALJ also looked at her post-alleged onset date work. Now, this was not substantial gainful activity, admittedly, but it does suggest that Ms. Richards was not as limited as she and her witnesses stated. She was able to do some things. And finally, he did take a look at the activities of daily living, and as I mentioned before, this was appropriate. They were fairly significant. She was able to maintain relationships. She took her medications without reminders. She cared for her own personal needs. She did some cooking. She did household chores with breaks, and I emphasize that because the ALJ didn't just blankly say she did all these things. He acknowledged the fact that she stated that she had limitations in doing those. I won't go through all of the daily activities, but certainly you get the idea. The point that she's also making in the brief with regard to on-task, again, we maintain that that issue is waived, but for the sake of argument, I would like to point out that the ALJ acknowledged and accommodated any on-task limitations in the RFC. As counsel has acknowledged, this is a very detailed RFC, and the mental limitations here are for simple, routine, repetitive work activity. She can maintain the concentration only to perform simple tasks and remember simple work-like procedures. She can tolerate only a flexible, goal-oriented pace, and importantly, she was precluded from fast-paced work activity like assembly line production work with rigid or strict productivity requirements. This goes directly to on-task, and finally, only superficial interactions with coworkers, supervisors, and the public. The next issue I would like to briefly address is the comparison between the two decisions. Ms. Richards maintains that the ALJ just rubber-stamped this prior decision. That couldn't be any further from the truth. The two decisions are actually quite distinct. At Step 2, in the prior decision, the first ALJ found no severe mental impairments whatsoever. The current ALJ did, of course. He found depression, PTSD, and anxiety to be severe impairments. He also found obesity and neuropathy and carpal tunnel to be severe, and the prior ALJ did not. Also, in the RFC, the current ALJ, as I mentioned, fully accommodated plaintiff's mental impairments by including functional limitations, which account for the on-task issues that may have been present, and the prior ALJ did not. The ALJ mentioned the first decision, and that first decision, by the way, is in the record at 184 to 192. He did mention it, and he had to, but he mentioned it only in the context of whether a reopening was appropriate. Having determined that it was not, he proceeded to properly employ a de novo review of the evidence. And then just very briefly addressing these mental impairment allegations, I'd just like to make a few points that the ALJ also made. Ms. Richards was never hospitalized for a psychiatric or emotional reason. There's no evidence that she has regularly or consistently taken psychotropic medications, and of those medications that she does take, there's no evidence of ongoing long-term side effects. The Northeastern Treatment Notes reflect objective findings of an appropriate appearance, good insight, orientation times four, normal thought content, coherent thinking, normal speech, and her concerns, when you look at these treatment notes in detail, her concerns mainly involved day-to-day living, personal relationships, and financial concerns. She also failed to show for several appointments, but interestingly, she did follow through for several appointments that were designed to help her with paying utilities and finding houses to clean for extra money. She had issues attending some therapy sessions due to babysitting responsibilities. Once again, this flies in the face of her severe mental allegations that she's unable to relate with people. She kept busy taking her daughter to softball games and other extracurricular activities, crocheting and teaching others to crochet. And I'm running out of time, so unless there are any questions, I thank you very much for your time, and I ask you to uphold the LJ's decision. Thank you, Counsel. Your Honor, specifically to the narrow point of the best place in the record discussing activities of daily living and overemphasizing them, as much as I like the one about the babysitting because I find it interesting, and that's in the briefing, probably the most simply jotted and straightforward is on paragraph stretching from error 21 to 22, which includes things that she could handle relationships because she maintained a relationship with her current boyfriend and things like the Commissioner has stated today that she's able to take her medications without reminders and to do household chores with breaks. Specifically, okay, fine, yeah, that goes to show that it was included, but where was the credibility analysis? What exactly was believed and why? And if it was all believed, then which part of it wasn't believed because it didn't match up, the RFC didn't match up to the allegations? The pages of discussion where there's record summaries, such as AR 26-29, those don't address the duty, which is to do the credibility analysis. Also, in response to supposedly waiving the on-task argument, in the district court brief, it's implicit in every prong of the Bjornsson analysis in the activities of daily living from health, from family members to flexibility of scheduling to lack of minimum performance standards that there are on-task problems in addition to the fact that as raised before, had the credibility analysis been fixed, the RFC and the result would be different. Unless you have any questions, Richard's rest. Thank you, counsel. Thanks to both counsel. The case is taken under advisement.